J-S16043-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :               PENNSYLVANIA
                                          :

v.                                :

                                          :

ADELBERTO SULIT,                 :
                                          :

            Appellant           :          No. 3027 EDA 2018

Appeal from the Judgment of Sentence August 23, 2017
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002440-2015

BEFORE: DUBOW, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:             Filed: June 25, 2020

Adelberto Sulit ("Sulit") appeals from the judgment of sentence imposed following his conviction of unlawful contact with a minor, statutory sexual assault, corruption of minors, indecent assault – person less than 16 years of age, and contempt for violation of order or agreement.[1]  We affirm.

In its Opinion, the trial court set forth the detailed factual history underlying the instant appeal, which we adopt as though fully restated herein. *See* Trial Court Opinion, 5/22/19, at 2-9.  Succinctly, Sulit was involved in a sexual relationship with a 14-year-old female family member for a period of approximately 8 months.  The victim ultimately admitted to her paternal aunt, Maria Galsim ("Galsim"), that she and Sulit were "romantically and sexually

---

[1] 18 Pa.C.S.A. §§ 6318(a)(1), 3122.1(b), 6301(a)(1)(ii), 3126(a)(8); 23 Pa.C.S.A. § 6114(a).

involved," and Galsim accompanied the victim to the police station to give a statement. *Id.* at 6-7. The victim obtained two Protection From Abuse Orders ("PFA") against Sulit, both of which Sulit violated on more than one occasion. *Id.* at 7.

A jury convicted Sulit of the above-mentioned crimes. The trial court deferred sentencing, and ordered the preparation of a pre-sentence investigation report ("PSI"), as well as an evaluation under Megan's Law.[2] On August 23, 2017, the trial court sentenced Sulit to an aggregate term of 5 to 10 years in prison, with credit for time served, followed by 10 years of reporting probation, to be supervised by the Sex Offender Unit. Additionally, the trial court directed that Sulit shall have no unsupervised contact with minors, complete sexual offender treatment, and comply with all other conditions of supervision.

Sulit filed a timely post-sentence Motion, which the trial court denied.[3] On March 20, 2018, Sulit filed a counseled Petition for relief pursuant to the

_____

[2] Following an evaluation by the Sexual Offenders Assessment Board, Sulit was determined not to be a sexually violent predator ("SVP").

[3] The trial court states that it denied Sulit's post-sentence Motion on January 2, 2018. Trial Court Opinion, 5/22/19, at 1. However, the docket does not include the date on which the Motion was denied, nor does the sparse certified record contain a copy of the post-sentence Motion. *See Commonwealth v. Lopez*, 57 A.3d 74, 82 (Pa. Super. 2012) (stating that "it is an appellant's duty to ensure that the certified record is complete for purposes of review.") (citation, quotation marks, and brackets omitted).

Post Conviction Relief Act ("PCRA"),[4, 5] seeking reinstatement of his direct appeal rights, *nunc pro tunc*. The PCRA court reinstated Sulit's direct appeal rights on October 10, 2018. Sulit thereafter filed a Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Sulit now raises the following issues for our review:

1. Whether the [trial] court abused its discretion, where it imposed an aggregate [] sentence of five (5) to ten (10) years, followed by fifteen years [of] probation[, [6]] … a manifestly excessive sentence in the consecutive aggravated guideline range that was wholly unreasonable based on the circumstances of the case, in violation of 42 Pa.C.S.A. [§] 9721(b) of the Sentencing Code, where [Sulit] had no prior criminal history, was deemed by the sexual evaluation to not be a[n SVP], was not likely to re-offend[,] where he had an excellent employment history and substantial family report [*sic*], and the jury's verdict was against the weight of the evidence?

2. Whether the jury's verdict was against the weight of the evidence, where the [victim] offered numerous inconsistent and vacillating accounts, wherein she intermittently denied, affirmed and altered allegations that she had a sexual relationship with [Sulit], the Commonwealth offered no corroborative physical evidence supporting either [] Galsim's claim that she had a taped confession of [Sulit] admitting to having sex with the [victim,] or the [victim's] claim that [Sulit] sent her threatening emails, and [Sulit] presented character evidence?

3. Whether the [trial] court abused its discretion in sustaining the Commonwealth's objection to the proposed testimony of [Sulit's]

_____

[4] **See** 42 Pa.C.S.A. § 9541-9546.

[5] Sulit similarly failed to include a copy of the PCRA Petition in the certified record. **See Lopez**, **supra**.

[6] Sulit incorrectly states that his sentence includes 15 years of probation.

- 3 -

wife, that [Sulit] could not have had sexual relations with the [victim], because he suffered from Type 2 diabetes, thereby denying [Sulit] a fair trial?

Brief for Appellant at 6-7 (footnote added).

In his first claim, Sulit argues that the trial court abused its discretion by imposing a manifestly excessive sentence. *See id.* at 19-26. Sulit claims that the victim provided inconsistent accounts of the sexual abuse throughout the course of these proceedings. *Id.* at 21-24. Sulit also argues that he introduced character evidence and relevant information about his employment. *Id.* at 24. According to Sulit, the sentence imposed is "disproportionate to his conduct and rehabilitative needs." *Id.* at 25.

Sulit's claim challenges the discretionary aspects of his sentence. "It is well-settled that, with regard to the discretionary aspects of sentencing, there is no automatic right to appeal." *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. 2010). Before we address the merits of a discretionary sentencing claim,

> [w]e conduct a four-part analysis to determine: (1) whether the appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether the appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (some citations omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were

either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Id.** (quotation marks and citation omitted). Further,

> [i]n determining whether a substantial question exists, this Court does not examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

**Commonwealth v. Dodge**, 77 A.3d 1263, 1270 (Pa. Super. 2013).

Here, Sulit filed a timely Notice of Appeal, *nunc pro tunc*, preserved his claim in his post-sentence Motion,[7] and included a separate Rule 2119(f) Statement in his appellate brief. In his Rule 2119(f) Statement, Sulit argues that the trial court imposed a manifestly excessive and unreasonable sentence, which "went well beyond what was required to foster [Sulit's] rehabilitation…." Brief for Appellant at 18. Sulit's argument presents a substantial question for our review. **See Commonwealth v. Williams**, 69 A.3d 735, 742 (Pa. Super. 2013) (stating that "[a] sentence that

---

[7] As we noted above, Sulit's post-sentence Motion is not included in the certified record. **See Lopez**, **supra**. Therefore, we are unable to ascertain the precise question previously raised before the trial court, and we could deem this issue waived on this basis. **See id.** (stating that an appellant's "failure to ensure that the record provides sufficient information to conduct a meaningful review constitutes waiver of the issue sought to be reviewed.") (citation, quotation marks, and brackets omitted). However, because the trial court addressed Sulit's claim in its Opinion, we will proceed with our review.

disproportionally punishes a defendant in excess of what is necessary to achieve consistency with the section 9721(b) factors violates the express terms of 42 Pa.C.S.[A.] § 9721(b)….").

We adhere to the following standard of review:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Robinson**, 931 A.2d 15, 26 (Pa. Super. 2007).

"In every case in which the court imposes a sentence for a felony … the court shall make as part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." 42 Pa.C.S.A. § 9721(b); **see also Commonwealth v. Mouzon**, 812 A.2d 617, 620-21 (Pa. 2002) (plurality). The Sentencing Code also provides that "the [trial] court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b); **see also Commonwealth v. McClendon**, 589 A.2d 706, 713 (Pa. Super. 1991) (stating the "the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation."). Further, the trial court must

consider the Sentencing Guidelines. ***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (stating that "[w]hen imposing a sentence, the [trial] court is required to consider the sentence ranges set forth in the Sentencing Guidelines….").

In its Opinion, the trial court set forth a detailed explanation of its reasons for imposing the sentence, including an assessment of Sulit's background and personal circumstances, the nature of the offense, and the relevant Sentencing Guidelines. ***See*** Trial Court Opinion, 5/22/19, at 9-13. In particular, the trial court noted the "deeply disturbing" nature of the crimes, explaining that Salit "not only preyed on [the victim's] young age, he [also] violated his social duty to protect society's most vulnerable members[;] he exploited his family's trust[;] and he repeatedly abused his familial role in one of the most offensive possible ways." ***Id.*** at 10. The trial court also highlighted Salit's "arrant lack of remorse." ***Id.*** at 11. We discern no abuse of the trial court's sentencing discretion, and affirm on the basis of the trial court's Opinion. Moreover, we observe that the trial court had the benefit of a PSI. ***See Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988) (explaining that where a sentencing judge considered a PSI, it is presumed that they are "aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors."). Accordingly, Sulit is not entitled to relief on this claim.

In his second claim, Sulit asserts that the verdict was against the weight of the evidence. *See* Brief for Appellant at 26-30. Specifically, Sulit claims that the victim "gave wide and varied accounts in which she first denied having a sexual relationship with [Sulit], when questioned by police and social services, then admitted to having sex with [Sulit] but repeatedly chang[ed] the circumstances surrounding their sexual encounters." *Id.* at 27. Sulit points to apparent inconsistencies in statements the victim made during trial, and during previous conversations with police.[8] *Id.* at 27-29. Additionally, Sulit states that he presented character evidence regarding his "reputation in the community for being peaceable, law abiding, and non-violent." *Id.* at 29.

As this Court has recognized,

[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the lease assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence.

*Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2015) (citation omitted); *Commonwealth v. Smith*, 146 A.3d 257, 265 (Pa. Super. 2016) (stating that "[i]n order for an appellant to prevail on a challenge to the

---

[8] We observe that Sulit did not provide proper citation to the record to identify, with specificity, when the victim made the allegedly inconsistent statements. *See* Pa.R.A.P. 2119(c) (requiring reference to the place in the record where evidence may be located).

weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." (citation omitted)). Further, "in instances where there is conflicting testimony, it is for the jury to determine the weight to be given the testimony. The credibility of a witness is a question for the fact-finder." *Commonwealth v. Hall*, 830 A.2d 537, 542 (Pa. 2003) (citation omitted).

In its Opinion, the trial court summarized the relevant evidence, addressed Sulit's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 5/22/19, at 15-16. We agree with the trial court's conclusion, and affirm on this basis as to Sulit's second claim. *See id.* Sulit essentially asks us to re-weigh the evidence presented at trial, and to reassess the victim's credibility—tasks we may not undertake. *See Hall*, *supra*; *see generally Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006) (stating that "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." (citation omitted)). Because the verdict does not "shock the conscience of the court," *Smith*, *supra*, Sulit is not entitled to relief on this claim.

In his third claim, Sulit contends that the trial court abused its discretion by precluding certain testimony by his wife. *See* Brief for Appellant at 31-34. According to Sulit, his wife "attempted to explain to the jury that [Sulit] could not have engaged in sexual intercourse with the [victim], … because he suffered from Type 2 diabetes…." *Id.* at 31. Sulit claims that such testimony

was proper, even in the absence of expert testimony, because "[i]f anyone would have first[-]hand knowledge as to whether [Sulit] had been rendered impotent by diabetes, … it would have been his wife." *Id.* at 34.

In its Opinion, the trial court set forth the proper standard of review and relevant law, addressed Sulit's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 5/22/19, at 17-19. The trial court specifically stated that, as a lay witness, Sulit's wife was "not qualified to share her 'understanding' of how [Sulit's] medical condition affected his physiological ability to engage in sexual intercourse." *Id.* at 18. We agree with the trial court's conclusion that the admission of such testimony by a lay witness would not have been proper, and we affirm on the basis of the trial court's Opinion. *See id.* at 17-19. Additionally, as the trial court noted, Sulit offered no other evidence or medical records to confirm a Type 2 diabetes diagnosis. *Id.* at 19. Thus, Sulit is not entitled to relief on this claim.

Judgment of sentence affirmed.

Judge Dubow joins the memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/25/20

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CRIMINAL SECTION**



| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | |
| | : | |
| v. | : | **CP-51-CR-0002440-2015** |
| | : | |
| **ADELBERTO SULIT** | : | **3027 EDA 2018** |

CP-51-CR-0002440-2015 Comm. v. Sulit, Adelberto
Opinion

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
8274196101

**OPINION**

Lane, J.                                                    **May 22, 2019**

## OVERVIEW AND PROCEDURAL HISTORY

On March 29, 2017, following a jury trial, Adelberto Sulit ("the Appellant") was found guilty of several offenses, including unlawful contact with a minor, 18 Pa.C.S.A. § 6318(a)(1); statutory sexual assault, 18 Pa.C.S.A. § 3122.1(b); corruption of minors, 18 Pa.C.S.A. § 6301(a)(1)(ii); indecent assault, 18 Pa.C.S.A. § 3126(a)(8); and contempt for violation of order or agreement, 23 Pa.C.S.A. § 6114(a).

On August 23, 2017, the Appellant was sentenced to an aggregate five to ten years of incarceration, followed by ten years of reporting probation. The Appellant filed a post-sentence motion to modify his sentence on September 1, 2017, which was denied without a hearing on January 2, 2018. The Appellant filed a timely notice of appeal on October 11, 2018, and on November 1, 2018, the Appellant filed a concise statement of errors complained of on appeal, raising the following issues:

1. Whether the lower court abused its discretion, where it imposed an aggregate consecutive sentence of five (5) to ten (10) years, followed by fifteen years probation which consisted of two (2) to four (4) years with a consecutive term of five (5) years probation for Statutory Sexual Assault, 18 Pa.C.S.A. § 3122.1(b), followed by one and one-half (1 1/2) to three (3) years for Unlawful Contact with Minor, 18 Pa.C.S.A. § 6318(a)(1), followed by one (1) to two (2) years with a

1
*Commonwealth v. Adelberto Sulit*

consecutive term of five years probation, for Corruption of Minors 18 Pa.C.S.A. § 6301(a)(1), followed by six (6) to twelve (12) months for Indecent Assault, Person less than 16 years of Age, 18 Pa.C.S.A. § 3126(a)(8), followed by five years probation for Contempt for Violation of Order or Agreement, 23 Pa.C.S.A. § 6114(a), a manifestly excessive sentence in the consecutive aggravated guideline sentencing range that was wholly unreasonable based on the circumstances of the case, in violation of 42 Pa.C.S.A. § 9781(c) of the Sentencing Code, where Appellant had no prior criminal history, was deemed by the sexual evaluation to not be a sexually violent predator, was not likely to re-offend where he had an excellent employment history and substantial family support, and the jury's verdict was not supported by the force of the evidence?

2.  Whether the jury's verdict was against the weight of the evidence, where the Complainant offered numerous inconsistent and vacillating accounts, wherein she intermittently denied, affirmed and altered allegations that she had a consensual sexual relationship with Appellant, the Commonwealth offered no corroborative physical evidence supporting either Maria Galsim's claim that she had a taped confession of Appellant admitting to having sex with the Complainant or the Complainant's claim that Appellant sent her threatening emails, and Appellant presented character evidence?

3.  Whether the lower court abused its discretion in sustaining the Commonwealth's objection to the proposed testimony of Appellant's wife, that Appellant could not have had sexual relations with the Complainant, because he suffered from Type 2 diabetes, thereby denying the Appellant a fair trial?

## FACTS

The Complainant in this case, A.C., was born on July 9, 1999, and the acts alleged against the Appellant began in 2014, when she was fourteen years old. (N.T. 03/23/2017 at 57, 63–64). A.C.'s father and the Appellant are cousins, and A.C. regarded the Appellant as her uncle. (*Id.* at 59–60). She was also close friends with the Appellant's children, Althea and Zack, and spent almost every other weekend at the Appellant's home. (*Id.* at 61, 73–74). A.C. testified that when she spent the night at the Appellant's home, she slept downstairs on the living-room couch, and the Appellant and his family—his wife, children, and his wife's parents—slept in the upstairs bedrooms. (*Id.* at 62–63).

When A.C. was fourteen years old and the Appellant was forty-five, the two began a sexual relationship that lasted from February 2014 until September 2014. (N.T. 03/23/2017 at 63–64). The first incident occurred late one evening in the Appellant's home, after the other household members went to bed. (*Id.* at 63–64, 74). On that night, A.C. was lying on the couch watching TV when the Appellant approached her and kissed her on her mouth. (*Id.* at 66). He completely undressed himself, and in response, A.C. removed her shorts and underwear. (*Id.* at 67–69). The Appellant continued to kiss her, touched her breasts, and had vaginal intercourse with her until he ejaculated. (*Id.* at 69, 72). During trial, A.C. testified that his penis was hard and hurt when he pushed it in, and the incident left her feeling "disturbed." (*Id.* at 70, 73). A.C. also testified that, on one occasion, the Appellant put his penis in her mouth.[1] (*Id.* at 83–84). The Appellant and A.C. had sexual intercourse on several other occasions after the first incident. According to A.C., the two of them had sex "about two times a month," during the nights she slept over at the Appellant's home. (*Id.* at 74). Their last sexual encounter occurred on September 25, 2014.[2] (*Id.* at 74, 114).

On August 28, 2014, A.C.'s paternal aunt, Maria Galsim ("Ms. Galsim"), began to suspect that A.C. and the Appellant were having an inappropriate relationship. (N.T. 03/23/2017 at 85; N.T. 03/24/2017 at 87). On that date, Ms. Galsim and A.C. were in Ms. Galsim's home, getting ready to go on a family outing. (N.T. 03/24/2017 at 87). Ms. Galsim heard several iMessage notifications coming from A.C.'s iPhone; she examined the phone and saw several messages from a contact named "Mon Amour." (*Id.* at 88). The messages from "Mon Amour" stated that he and

---

[1] Aside from her testimony on March 23, 2017 and an interview with the Philadelphia District Attorney's office on March 16, 2017, A.C. did not otherwise mention or report that she performed oral sex on the Appellant. (N.T. 03/24/2017 at 48, 78–80).

[2] At one point during her trial testimony, A.C. erroneously stated that her relationship with the Appellant continued until September of 2015. (N.T. 03/23/2017 at 75–78). However, she quickly corrected the error, and thereafter consistently testified that the relationship ended in September of 2014. (N.T. 03/23/2017 at 75–78). A.C. also testified that she did not use a translator during the Appellant's preliminary hearing and mistakenly stated that the relationship ended in October, rather than September of 2014, explaining that she was very nervous, "mixed up," and confused during the preliminary hearing. (N.T. 03/23/2017 at 121–22; N.T. 03/24/2017 at 20).

Marissa were out buying furniture for Althea's bedroom. (N.T. 03/24/2017 at 89). Ms. Galsim also described a second message from "Mon Amour," which said that A.C. "was bleeding through a lot [more] than normal . . . [but] it's okay, it means you're a virgin again." (*Id.* at 91). Ms. Galsim testified that she immediately assumed "Mon Amour" was the Appellant, as "Marissa" and "Althea" are the names of the Appellant's wife and daughter, respectively. (*Id.* at 91). Later that day, she confronted A.C. about the messages and asked her who sent them. (*Id.* at 92). A.C. told her that the messages were from her boyfriend, whom she knew from school. (*Id.* at 91). Ms. Galsim "took her word for it" and dropped the issue. (*Id.* at 93). At trial, A.C. explained that she lied to her Aunt because she thought that she and the Appellant were in love, and she wanted to protect him. (N.T. 03/23/2017 at 91).

A.C. later admitted that she used "Mon Amour" as the Appellant's contact name in her phone, and the messages that Ms. Galsim saw were, in fact, sent by the Appellant. (*Id.* at 87–88). A.C. testified that she chose "Mon Amour" for the Appellant's contact name because it is the Spanish translation for "my love," and, at the time, she was in love with the Appellant. (*Id.* at 87, 91). At trial, the Commonwealth introduced screenshots of text messages that were sent between A.C. and the Appellant on September 26, 2014; A.C. explained that the messages referred to a sexual encounter between her and the Appellant that occurred the day before:[3]

A.C.: Did you enjoy?

**Mon Amour ("Appellant"):** Yes, I did.

A.C.: I did not enjoy

**Appellant:** But why?

---

[3] At trial, A.C. testified in Tagalog, her native language, and required the use of a translator. (N.T. 03/23/2017 at 56). During her testimony, A.C. read directly from screenshots of the text messages sent between her and the Appellant; the translator translated A.C.'s oral testimony—not the screenshots. (*Id.* at 103–110).

4

*Commonwealth v. Adelberto Sulit*

**A.C.:** It's you. Are you broke? You broke it. I lost my appetite when you give me that kind of look. When you're staring at me like that.

**A.C.:** Did you enjoy it a while ago?

**Appellant:** You're too much. What are you thinking of?

**A.C.:** I didn't feel your closeness, Love. I didn't—I didn't feel from you a while ago."

**Appellant:** Huh? What? What are you thinking of love? Just sleep with it.

**A.C.:** Don't 'huh' me cause I know you know what I'm talking about. I'm not thinking of anything. I don't want to think of anything.

**Appellant:** What happened to you?

**A.C.:** I don't know what's going on with you at that time. It's only now that I feel to you about it. Please tell me if you don't have feelings for me. I don't want to—it's hard to feel or to be broken.

**Appellant:** What are you talking about? What are you saying? I don't understand you. Just calm down. I didn't have a good time a while ago so just calm down. Just because you were not satisfied, you're acting up like that.

**A.C.:** Yeah. Right. Sure. Sure, that you don't understand me. Sure, that you don't understand me. You like? I let you understand. I wasn't—it's not that I'm not satisfied, I just lost my appetite. That's why I'm trying to be good to you when we were lying down.

**Appellant:** Oh, my love—not to you. Why are you like that?

**A.C.:** Repeat what happened a while ago. I promise I'm going to hate you truly.

**Appellant:** I cummed two times a while ago, and that's too much. I really miss you. And now you're trying to get mad at me.

**A.C.:** You cummed inside? Inside monay or what?[4]

**Appellant:** Outside. Didn't you see it?

**A.C.:** I'm not quarrelling with you, Love. I'm just telling you. I'm not quarrelling with you, Love. The way you look at me, what are you thinking about? I'm just losing appetite. I just want you to know my point. I'm not—I'm not quarreling with you.

---

[4] The interpreter explained that "monay" is another word for "vagina". (N.T. 03/23/2017 at 112).

**Appellant:** Okay. Next time, I'll just close my eyes.

**A.C.:** I know you cummed one time only when you put out your penis, and then you push it in again. I hope it didn't come inside. Right? But I didn't know that you cummed two times.

(N.T. 03/23/2017 at 93–114) (direct examination questions and statements from the ADA omitted).

A few weeks after this conversation, in mid-October of 2014, Ms. Galsim became suspicious again after A.C.'s sister told her and A.C.'s maternal aunt, Maria Avelina Coquia ("Ms. Coquia"), about inappropriate comments the Appellant made about A.C. on Facebook.[5] (N.T. 03/24/2017 at 93–94). Later that same day, Ms. Galsim again confronted A.C. about whether she was inappropriately involved with the Appellant. (*Id.* at 97–99). At first, A.C. denied it, but she eventually admitted that she and the Appellant were romantically and sexually involved. (*Id.* at 99–100).

The following day, on October 18, 2014, Ms. Galsim called the Appellant and left a voicemail, stating "If you do not try to contact me right away—I need to speak to you about something, I'm going to go ahead—go to your residence, and we're going to talk in front of your family, your wife." (*Id.* at 101). The Appellant returned her call and agreed to meet Ms. Galsim and Ms. Coquia at a restaurant, so the three of them could address the situation. (*Id.* at 102–03). During their meeting, Ms. Galsim asked the Appellant whether he had "unlawful contact or inappropriate contact or [a] relationship with [A.C.]," to which the Appellant responded, "Yes." (*Id.* at 103). Ms. Galsim also testified that Ms. Coquia recorded the entire conversation and the Appellant's admission on her phone, and that the Appellant did not know the conversation was

---

[5] The alleged Facebook comments were not admitted at trial, as defense counsel objected to the comments on hearsay grounds, and this court sustained the objection. (N.T. 03/23/2017 at 94).

being recorded. (*Id.* at 106–07). She also stated that she listened to the recording after the meeting concluded, but, at the time of trial, the recording no longer existed. (N.T. 03/24/2017 at 107).

That evening, Ms. Galsim took A.C. to the Philadelphia Police, where A.C. gave the following statement to Officer Terry:

> Complainant states 2 of 2013 she had sexual intercourse with below male (uncle) at [3851 J Street, the Appellant's home]. Complainant states below male and herself both agreed not to say anything because they would get in trouble. Complainant states the last time she had sexual intercourse, penis in vagina, sex with male was two months ago [in August] of 2014 at his home in his bedroom. Complainant states that she consented and was not forced, and condoms were used.

(N.T. 03/23/2017 at 22–23, 126; Exhibit C-1, N.T. 03/24/2017 at 54, 108). Before the interview was complete, A.C. abruptly told the officer that she no longer wanted to participate. (N.T. 03/23/2017 at 127). At trial, she explained that she stopped the interview because she did not want to cooperate with her family and that she was "protecting [the Appellant.]" (*Id.* at 127). Specifically, she said that she wanted to protect him because she blamed herself for their inappropriate relationship and did not realize that he was the party at fault. (*Id.* at 128). After the interview, on October 20, 2014, A.C. obtained a protection from abuse ("PFA") order against the Appellant. (*Id.* at 129).

Three weeks later, on November 6, 2014, A.C. was interviewed by the Philadelphia Children's Alliance ("PCA"). (*Id.* at 129). During her interview, A.C. denied that she ever had sex with the Appellant—consensual or otherwise. (*Id.* at 130–31). At trial, A.C. testified that she lied to PCA about the relationship because she blamed herself, stating, "[I thought] everything is my fault, but I didn't realize that he also had a mistake or fault with this. . . . I was trying to protect him during this time. . . . [I was afraid] that he will be incarcerated." (*Id.* at 130–31).

During November of 2014, the Appellant violated the PFA on two occasions. (*Id.* at 133). On the first occasion, he met A.C. after school and gave her a cellphone, which he used to secretly

communicate with her. (N.T. 03/23/2017 at 135). On November 24, 2014, the Appellant violated the order again, when he drove to her home and picked her up in his car. (*Id.* at 136–37). A.C. testified that the two of them had a conversation in his car, but she could not remember what the conversation was about. (*Id.* at 138).

On December 9, 2014, A.C. gave a second statement to the police, in which she reported that she had an extended, consensual sexual relationship with the Appellant. (*Id.* at 132). A.C. reported that she and the Appellant had sexual intercourse on multiple occasions between February and September of 2014. (*Id.*). In her statement, A.C. also explained that she was not initially forthcoming about the relationship because she was afraid, did not know what to say, and wanted to protect the Appellant. (*Id.* at 132). Following a PFA hearing, A.C. obtained a second PFA against the Appellant, in which he agreed to cease all contact with A.C. for three years. (*Id.* at 138–39).

Two years later, between November and December of 2016, the Appellant violated the PFA orders on multiple occasions. (N.T. 03/24/2017 at 8–16). At trial, the Commonwealth introduced screenshots of several messages that the Appellant sent to A.C. during this time. (*Id.* at 6). A.C. explained that she did not want to talk to the Appellant and ignored most of his messages. (*Id.* at 7). Eventually, he became angry and threatened her: "He was threatening me that if I don't respond to him, then everything will break loose with the whole families." (*Id.*). A.C. also recalled a particularly disturbing conversation in which the Appellant threatened A.C. again, telling her "You can never love another one except me . . . . If I lose all my patience . . . you might not like the end of this." (*Id.* at 12, 15). Within that same conversation, he told her, "Try not to come back to me and you will not like what's going to happen." (*Id.* at 14). Finally, the Appellant threatened to post nude photos of A.C. on his social media accounts and distribute the photos to "all the

people" if she continued to ignore him. (N.T. 03/24/2017 at 14–16). A.C. testified that his threats terrified her and made her feel angry. (*Id.* at 16).

## DISCUSSION

**I.     The trial court did not err or abuse its discretion in imposing an aggregate sentence of five to ten years of incarceration, followed by ten years of reporting probation.**

A sentencing court is in the "best position to measure factors such as the nature of the crime, the defendant's character, the defendant's display of remorse, defiance, or indifference," and is therefore given broad deference. *Commonwealth v. Riggs*, 63 A.3d 780, 786 (Pa. Super. 2012). A sentence must be within the statutory limits and should require confinement that is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant. *Commonwealth. v. Corson*, 444 A.2d 170, 172 (Pa. Super. 1982).

If the sentence imposed is within the statutory limits, there is no abuse of discretion unless the sentence is manifestly excessive so as to inflict too severe a punishment. *Id.* An abuse of discretion is more than just an error in judgment, and, on appeal, the trial court will not be found to have abused its discretion unless the appellant can establish, by reference to the record, that the sentencing court exercised its judgment for reasons of partiality, prejudice, bias, or ill-will. *Commonwealth. v. Clarke*, 70 A.3d 1281, 1287 (Pa. Super. 2013). Reasonableness of the sentence imposed by the trial court is based on: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. 42 Pa.C.S.A. § 9781(d).

In the case at bar, this court did not err in imposing a sentence of five to ten years of incarceration—followed by ten years of reporting probation. This court properly weighed the

9
*Commonwealth v. Adelberto Sulit*

nature and circumstances of the offenses, the observable characteristics of the Appellant, the facts upon which the convictions were based, and the Pennsylvania Commission on Sentencing's suggested guidelines.

### a. This court properly weighed the nature and circumstances of the offense, the Appellant's background, and the findings of fact upon which the sentence was based and found that a mildly aggravated sentence was appropriate.

Here, the nature of the Appellant's crimes is deeply disturbing for several reasons. The Appellant's actions were particularly concerning to this court because of the victim's age and the close, familial relationship between the Appellant and the victim. The Appellant was about forty-five years old at the time of the alleged incidents; A.C. was only fourteen. (N.T. 03/23/2017 at 74). A.C. is also the Appellant's cousin's daughter, and she knew the Appellant as her uncle. (*Id.* sat 59–60). Before the Appellant's actions were exposed, A.C.'s father (Mr. Galsim) and the Appellant were best friends, and Mr. Galsim trusted the Appellant to take care of his daughter. (N.T. 08/23/2017 at 23). The Appellant not only preyed on A.C.'s young age, he violated his social duty to protect society's most vulnerable members, he exploited his family's trust, and he repeatedly abused his familial role in one of the most offensive possible ways. Moreover, the Appellant's actions were not contained to a single, isolated incident. Rather, the Appellant committed several distinct and separate acts, over an eight-month period, and this court noted that, as a result of the Appellant's actions, "these families that were once so close, are now torn apart and . . . probably beyond repair." (*Id.* at 36).

In fashioning its sentence, this court also considered the Appellant's familial, educational, and criminal background. Specifically, this court found that although the Appellant has no criminal record, a mildly aggravated sentence was appropriate, as the Appellant was equipped with all of the necessary resources to make proper, lawful, and responsible choices:

> This [Appellant] not only had proper education, he not only had proper family support, he not only had employment history, he had everything. He had all the resources and the education, and the social know how to make the right decisions. And he was equipped with all of that knowledge. . . . He knew what was right and what was wrong. But instead, he engaged with wrongful acts against this victim . . . over and over again.[6]

(N.T. 08/23/2017 at 21).

This court also considered the Appellant's failure to take responsibility for his actions and his arrant lack of remorse. The Sexual Offender Assessment Board found that, during the time he was sexually assaulting A.C., the Appellant "was promoting a relationship, at least in part to support or facilitate victimization." (*Id.* at 26–27). Additionally, even after the relationship ended and A.C. reported the incidents to the police, he continued to contact her—in direct violation two PFA orders. (N.T. 03/23/2017 at 135–37; N.T. 03/24/2017 at 8–16). Further, the Appellant repeatedly harassed the victim with multiple unwanted and often ignored text messages; instead of accepting that A.C. did not wish to speak to him, he became indignant and threatened to post nude photos of her on Facebook. (N.T. 03/24/2017 at 14–16). His repeated PFA violations and threats against the victim indicated to this court that each of the Appellant's crimes were calculated, brazen, and deliberate:

> The fact is that he didn't think that he would be caught, but he was. And the reason he didn't think that he would get caught is because he was taking advantage of someone who was much younger than him, someone that was emotionally less mature than him.
>
> He tried to make agreements with [A.C.], let's not tell anybody. He tried to make her feel like she was complicit in the act, that she was always doing something wrong, in a way to avoid being exposed.
>
> And when he felt that . . . .he was going to be exposed, that's when he started threatening her by text messages, telling her that if she said anything, he was going to make her life hell, his was going to post naked photos of her that she had sent to

---

[6] In imposing its sentence, this court incorporated the arguments put forth by the Commonwealth. (N.T. 08/23/2017 at 36).

him, and he was just using that as a way to cover himself. And that's extremely manipulative.

(N.T. 08/23/2017 at 21–22). It was clear to this court that the Appellant's abusive acts towards his victim were solely motivated by selfish impulses, he repeatedly exploited his familial role and his victim's youth, and he did not accept responsibility for his actions. Thus, a mildly aggravated sentence was appropriate, and the Appellant's sentence should be affirmed.

### b. This court properly considered the sentencing guidelines and the applicable statutory maximum sentences.

Finally, this court considered the guidelines put forth by the Commission on Sentencing. The Appellant has a prior record score of zero. (N.T. 08/23/2017 at 5). Unlawful contact with a minor, for the purpose of committing statutory sexual assault, is a first-degree felony and has an offense gravity score ("OGS") of six; the applicable sentencing guidelines recommend 3–12BC +/-6, and the statutory maximum for this offense is twenty years of incarceration.[7] Statutory sexual assault is also a first-degree felony and has an OGS of nine; the guidelines recommend 12–24BC +/-6, and the statutory maximum for this offense is twenty years of incarceration.[8] Corruption of minors is a third-degree felony and has an OGS of six; the guidelines recommend 3–12BC +/-6, and the statutory maximum for this offense is three and one-half to seven years of incarceration.[9] Indecent assault is a second-degree misdemeanor and has an OGS of four; the guidelines recommend RS-3 +/-3, and the statutory maximum is two years of incarceration.[10]

---

[7] In Pennsylvania, unlawful contact with a minor is graded "as the most serious underlying offense in subsection (a) for which the defendant contacted the minor"; and statutory sexual assault is graded as a first-degree felony. 18 Pa.C.S.A. § 6318(b)(1); 18 Pa.C.S.A. § 3122.1(b). Therefore, the Appellant's conviction for unlawful contact constituted a first-degree felony, subject to the statutory maximum of *twenty* years of incarceration. 18 Pa.C.S.A. § 1103(1).

[8] 18 Pa.C.S.A. § 3122.1(b); 18 Pa.C.S.A. § 1103(1).

[9] 18 Pa.C.S.A. § 6301; 18 Pa.C.S.A. § 1103.

[10] 18 Pa.C.S.A. § 3126(b)(1); 18 Pa.C.S.A. § 1104.

For his conviction of unlawful contact with a minor, the Appellant was sentenced to one and one-half to three years of incarceration. (*Id.* at 36). On the charge of statutory sexual assault, the Appellant was sentenced to a consecutive two to four years of incarceration, followed by five years of reporting probation. (N.T. 08/23/2017 at 36). On the charge of corruption of minors, the Appellant was sentenced to a consecutive one to two years of incarceration, followed by five years of reporting probation. (*Id.* at 36–37). On the charge of indecent assault, the Appellant was sentenced to a consecutive six to twelve months of incarceration. (*Id.* at 37). Finally, on the charge of contempt, the Appellant was sentenced to a concurrent six months of reporting probation. (*Id.*).

In sum, the sentences imposed on the charges of statutory sexual assault and corruption of minors fall within the standard range of the sentencing guidelines, and the sentences imposed on the charges of unlawful contact and indecent assault fall within the aggravated range of the sentencing guidelines. Pursuant to the relevant statutory maximums, it would have been within this court's discretion to impose an aggregate, maximum sentence of forty-nine years of imprisonment.[11] However, this court imposed an aggregate sentence of five to ten years of incarceration, followed by ten years of reporting probation—a sentence that falls within the sentencing guidelines and significantly below the statutory maximums. This court also considered the rehabilitative needs of the Appellant and ordered that the Appellant undergo sex offender treatment. (*Id.*). Therefore, it simply cannot be shown that this court abused its discretion by imposing a "manifestly excessive" sentence, and the sentence imposed by this court should be affirmed.

---

[11] *See supra* notes 7–10 and accompanying text.

## II.    The jury's verdict is not against the weight of the evidence.

As an initial matter, a challenge to the weight of the evidence must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Pa.R.Crim.P. 607(A)(1)–(3). Here, the Appellant presented a specific weight of the evidence claim in a timely post-sentence motion, which was denied by operation of law on January 2, 2018, pursuant to Pa. R. Crim. P. 720.[12]

The standard of review of a weight of the evidence claim is whether the trial court abused its discretion. *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000). The trial judge has the opportunity to hear and see the evidence presented, thus "appellate courts will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Id.* Moreover, when evaluating a trial court's ruling, "we keep in mind that an abuse of discretion is not merely an error in judgment." *Commonwealth v. Hardy*, 918 A.2d 766, 776 (Pa. Super. 2007). Rather, abuse of discretion involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law. *Id.* Conversely, proper exercise of discretion conforms to the law and is based on the facts of record. *Id.*

In exercising its discretion, a trial judge should not award a new trial because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 744 A.2d at 752. Rather, the role of the trial judge is to determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* at 751–52. Relief is only

---

[12] Pa. R. Crim. P. 720 states, in relevant part: "[T]he judge shall decide the post-sentence motion, including any supplemental motion, within 120 days of the filing of the motion. If the judge fails to decide the motion within 120 days, or to grant an extension as provided in paragraph (B)(3)(b), the motion shall be deemed denied by operation of law."

appropriate when the verdict is so contrary to the evidence that it is shocking to one's sense of justice. *Commonwealth v. Cousar*, 928 A.2d 1025, 1036 (Pa. 2007).

In the case at bar, the Appellant supports his weight of the evidence claim by arguing, in essence, that A.C. was not credible and testified inconsistently. However, it is well-settled that the jury is free to believe all, part, or none of the evidence presented at trial, and "the determination of the credibility of a witness is within the exclusive province of the jury." *Commonwealth v. Crawford*, 718 A.2d 768, 772 (Pa. 1998). Thus, it was within the jury's purview to consider the victim's testimony in light of her inconsistencies and her initial denial of the allegations. Further, the Commonwealth presented evidence—a text-message conversation—that independently corroborated both the existence and duration of the sexual relationship between A.C. and the Appellant. (N.T. 03/23/2017 at 93–114). The jury was presented with the fact that, during this conversation, the Appellant referred to A.C. as "my love," assured her that he did not ejaculate into her vagina, and explained that he will be different "next time":

**Appellant:** Oh, my love—not to you. Why are you like that?

**A.C.:** Repeat what happened a while ago. I promise I'm going to hate you truly.

**Appellant:** I cummed two times a while ago, and that's too much. I really miss you. And now you're trying to get mad at me.

**A.C.:** You cummed inside? Inside monay or what?[13]

**Appellant:** Outside. Didn't you see it?

**A.C.:** I'm not quarrelling with you, Love. I'm just telling you. I'm not quarrelling with you, Love. The way you look at me, what are you thinking about? I'm just losing appetite. I just want you to know my point. I'm not—I'm not quarreling with you.

**Appellant:** Okay. Next time, I'll just close my eyes.

---

[13] The interpreter explained that "monay" is a synonym for "vagina." (N.T. 03/23/2017 at 112).

(*Id.* at 112–14) (direct examination questions and statements from the ADA omitted).

This conversation indicated that, not only did the Appellant have sex with A.C., but the two had an ongoing sexual relationship—a relationship that the Appellant planned to continue. Further, despite the inconsistencies in her testimony, the text messages introduced at trial confirmed that the Appellant had a sexual relationship with A.C. until September 2014, as the messages were dated September 26, 2014, and the conversation referred to sexual intercourse that occurred the day before. (N.T. 03/23/2017 at 114). The timing and nature of their relationship was also corroborated by Ms. Galsim's testimony that she discovered inappropriate text messages from the Appellant on August 28, 2014 and confronted the Appellant on October 18, 2014. (N.T. 03/24/2017 at 91, 101–03). The nature of their relationship was further corroborated by the Appellant's possession of and threats to distribute nude photos of A.C.—photos that she gave only to him. (*Id.* at 14–17). Finally, at several points throughout the trial, the jury heard A.C. explain why she was not initially forthcoming or truthful about her relationship with the Appellant: She was in love with him, she wanted to protect him, and she blamed herself for the entire relationship. (N.T. 03/23/2017 at 91, 127, 130–32; N.T. 03/24/2017 at 63, 81).

Based on this evidence, the jury determined that A.C. was credible and rendered a verdict accordingly; it was within their exclusive province to do so. *Crawford*, 718 A.2d at 772. The inconsistencies in her testimony and initial denial of the allegations were not so clearly of greater weight that disregarding them caused a shocking miscarriage of justice. Thus, the jury's verdict is not against the weight of the evidence, the Appellant is entitled to no relief on this ground, and this court's decision should be affirmed.

### III.  Evidence that the Appellant may have suffered from type 2 diabetes was properly excluded.

Decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. *Commonwealth v. Benson*, 10 A.3d 1268, 1274 (Pa. Super. 2010). An abuse of discretion will be found if the trial court's judgment was "manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record." *Id.*

A fundamental consideration in determining the admissibility of evidence is its relevance. *Commonwealth v. Hawk*, 709 A.2d 373, 378 (Pa. 1998). Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Pa.R.E. 401. The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403.

In the case at bar, this court properly excluded evidence that the Appellant may have been suffering from a medical condition at the time of the alleged crimes. At trial, the Appellant sought to introduce testimonial evidence from his wife, Marissa Sulit, that the Appellant suffered from type 2 diabetes and that, based on her knowledge of this condition, he could not have committed the alleged acts:

> **Mr. Bennett (Counsel for the Appellant):** Ma'am, your husband has some medical problems, doesn't he?
>
> **Ms. Keesler ("ADA"):** Objection.
>
> **The Court:** Sustained.
>
> **Marissa Sulit ("Ms. Sulit"):** He's a Type 2—

**ADA:** Objection.

. . . .

**Mr. Bennett:** *Based on his—your knowledge of your husband's physical condition, do you believe these charges to be true?*

**ADA:** Objection.

**The Court:** Sidebar, please.

. . . .

**The Court:** That objection is sustained.

. . . .

**The Court:** I just want to put the objection that we did at sidebar, the discussions on the record.

**ADA:** Your Honor, I did object to counsel's question basically insinuating that the defendant had a physical condition, and him trying to elicit from the wife that as a result of that condition, he would not have been able to commit these charges.
I am objecting because I was given no notice that the defendant had potentially been suffering from some type of physical condition at the time that these crimes were committed.
Because, if he had given me notice, I could have called an expert in this case to rebut that argument.

. . . .

**Mr. Bennett:** --just to protect myself. Specifically, I was calling the wife to testify about what her understanding of what his condition would be. I believe that the wife could testify as far as what she understood the defendant to have.
As far as the veracity or weight of the evidence, obviously, it would be less than from an expert, but her understanding of what the facts are of her husband's condition, I truly believe that was admissible.

(N.T. 03/27/2017 at 84–88) (emphasis added).

In essence, the Appellant planned to introduce Ms. Sulit's "understanding of [the Appellant's] condition," in an attempt to show that, as a result of his condition, he was not physically capable of committing the alleged crimes. (*Id.*). However, this evidence was properly excluded, as Ms. Sulit was merely a lay witness and not qualified to share her "understanding" of how the Appellant's medical condition affected his physiological ability to engage in sexual intercourse.

Admitting the proffered evidence would have required the use of an expert witness. Expert testimony is necessary when evidence is "beyond the knowledge or experience of an average layperson and does not involve a matter of common knowledge." *Commonwealth v. Manivannan*, 186 A.3d 472, 485 (Pa. Super. 2018), *reargument denied* (July 7, 2018). An expert witness must be qualified through relevant "knowledge, skill, experience, training, or education" before he or she may testify about a subject that is beyond the knowledge of an average layperson. Pa.R.E. 702. Here, the correlation between—or the extent of the effect of—type 2 diabetes and an individual's ability to engage in sexual intercourse is certainly outside the common knowledge of the average juror. Thus, the evidence could not have been properly admitted without the use of an expert, and this court properly excluded Ms. Sulit's testimony on the subject.

It is also worth noting that, aside from Ms. Sulit's testimony, the Appellant did not present any evidence or medical records to corroborate his diagnosis of type 2 diabetes. Further, Ms. Sulit's testimony was properly excluded pursuant to Rule 403, as its probative value was outweighed by the risk of causing "undue delay" and wasting time. Pa.R.E. 403. The proffered testimony was introduced on the third and final day of a lengthy jury trial. Admitting the evidence, with the aid of expert testimony, would have significantly delayed the trial's conclusion, as proceedings would have been continued until the parties vetted and employed experts, produced expert reports, and so on. Thus, this court did not err, and its decision should be affirmed.

## CONCLUSION

After reading the applicable statutes, case laws, and rules, the trial court has neither erred nor abused its discretion. Accordingly, the trial court's decision should be affirmed.

BY THE COURT:

Lane, J.